UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-MJ-6484-HUNT

UNITED STATES OF AMERICA,

v.

ANDRES FELIPE ALZATE BUSTAMANTE,

                Defendant.
_____/

## DETENTION ORDER

THIS MATTER came before the Court upon the Government's motion to detain the Defendant, Andres Felipe Alzate Bustamante, prior to trial and until the conclusion thereof. On October 13, 2020, I conducted a hearing wherein I received evidence and heard arguments of counsel. I also considered memoranda submitted by the Defendant (DE 16) and the Government (DE 17) in support of their respective positions. Having considered that evidence and those arguments, as well as the statutory factors in 18 U.S.C. §3142(g), I hereby GRANT the Government's motion and order Defendant Andres Felipe Alzate Bustamante detained prior to trial, for the reasons stated on the record at the hearing and as further discussed below in accordance with the provisions of 18 U.S.C. § 3142(i).

A.    INTRODUCTION

The Defendant is charged by Criminal Complaint with conspiracy to possess with intent to distribute five kilograms or more of cocaine and attempt to possess with intent to distribute five kilograms or more of cocaine, in violation of Title 21, United States Code, Sections 846 and 841(a)(1) and (b)(1)(A). The United States sought detention on the bases of risk of non-appearance and danger to the community. On October 13, 2020, I held a hearing to determine whether any

1

condition or combination of conditions of release will reasonably assure the appearance of the Defendant as required and the safety of any person and the community. 18 U.S.C. § 3142(f). In order to detain a defendant pending trial, the Government must establish by preponderance of the evidence that no condition or combination of conditions will reasonably assure the Defendant's appearance as required. *United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985). The Government must establish by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any individual or the safety of the community. 18 U.S.C. § 3142(f)(2). Based upon the evidence presented,[1] specifically the allegations in the Criminal Complaint, which went essentially unchallenged, I find probable cause that the Defendant committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.). This finding gives rise to a rebuttable presumption that no condition or combination of conditions of release will reasonably assure the appearance of the Defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(A). Assuming, *arguendo*, that a defendant comes forward with sufficient evidence to rebut the statutory presumption, the presumption "remains in the case as an evidentiary finding militating against release, to be weigh[ed] along with other evidence." *United States v. Quartermaine*, 913 F.2d 910, 916 (11th Cir. 1990); *United States v. King*, 849 F.2d 485, 488 (11th Cir. 1988). Despite the presumption, however, the burden of persuasion is upon the Government to establish by clear and convincing evidence that the defendant poses a danger to the community, 18 U.S.C. § 3142(f), and/or to establish by a preponderance of the evidence that he poses a risk of flight. *Quartermaine*, 913 F.2d at 917. In determining whether the Government has met its burden

---

[1] At the hearing on October 13, 2020, the Defendant stipulated to a finding of probable cause.

by the requisite standard of proof, this Court must take into account the factors enumerated in 18 U.S.C. § 3142(g).

B.      FINDINGS OF FACT

The evidence adduced at the pretrial detention hearing consisted of the information contained in the Pretrial Services Report, the Criminal Complaint [DE 1], a proffer of additional facts contained by the Government (summarized in its memorandum, DE 17), the testimony of DEA Task Force Officer (TFO) Joshua Passman, testimony from the Defendant's sister, Angela Bustamante, and a proffer from defense counsel of testimony by the Defendant's mother, Olga Beasley.[2]  I considered all of this evidence in making my findings.

1. Government's Complaint

I take judicial notice of the Criminal Complaint [DE 1], which was adopted by TFO Passman as his direct testimony.  The Defendant did not challenge the facts in the Complaint on cross-examination.  As described in the Complaint (supplemented by additional details proffered by the Government and adopted by TFO Passman):

In or around September 2020, a cooperating individual ("CI-1") advised that he/she had a contact in Tampa, Florida – later identified as the Defendant – who was interested in purchasing multi-kilogram quantities of cocaine.  On or about September 15, 2020, the Defendant met with CI-1 at the Hard Rock Hotel in Hollywood, Florida.  During this meeting, which was audio recorded, CI-1 purported to have connections with individuals involved in the importation of multi-kilogram quantities of cocaine from The Bahamas to the South Florida. During the meeting,

---

[2] Ms. Beasley did not actually testify because of the unavailability of a Spanish-language interpreter.  Because the relevant portions of Ms. Beasley's testimony, concerning the equity in her home, were uncontroverted, I accepted a proffer of her testimony.

3

CI-1 introduced two individuals to the Defendant: another cooperating individual ("CI-2") and a confidential source ("CS"). CI-2 and the CS posed as the boat captains who would be transporting the cocaine from The Bahamas to South Florida. CI-2 and the CS advised the Defendant that if he (the Defendant) was willing to invest money in the load prior to them traveling to The Bahamas, they would provide him with cocaine at a price of $16,000.00 per kilogram plus an additional $4,000.00 per kilogram for transport. CI-1 told the Defendant that he (CI-1) would contact the Defendant once CI-2 and the CS were ready to make the trip. Initially, the Defendant expressed interest in investing $100,000 for 5 kilograms of cocaine.

In the days following the meeting, the Defendant and CI-1 communicated via Telegram, which is an encrypted messaging application. On or about September 21, 2020, the Defendant and CI-1 exchanged communications that included a code word confirming the previously agreed-upon amount of five kilograms and the Defendant seeking information to allow him to "plan the next couple of days" because he had "people waiting." In a subsequent conversation on September 27, 2020, the Defendant confirmed that he had "people waiting" and indicated that "a lot of my people like to cook the meant," which TFO Passman interpreted as a reference to cooking powder cocaine into crack.

On or about September 28, 2020, CI-1 directed the Defendant to meet with him/her on the following day outside of a mall. On September CI-1 picked up the Defendant, who was carrying a black duffel bag with white lettering as well as a small fanny pack. Upon entering CI-1's vehicle, the Defendant advised CI-1 that he was in possession of the $100,000.00. CI-1 called CI-2 and an undercover detective ("UC") who were waiting at a nearby location to come over to the vehicle to participate in the meeting. CI-2 and the UC entered the vehicle, and sat in the back seat while the Defendant sat in the front passenger seat. During the meeting, the Defendant made statements

4

suggesting that he had thought he would be taking possession of the cocaine that day and that he planned on selling the cocaine for $35,000-$45,000 per kilogram. During the meeting, the Defendant made several phone calls to someone that the Defendant referred to as an "investor" while discussing the logistics of the pending deal. The Defendant told CI-1 that there were other people[3] who had additional money with them to purchase additional kilograms of cocaine; however, they did not feel comfortable leaving it with CI-1. CI-2 advised the Defendant that the additional money had to provided up front prior to the purported trip or the cost of additional kilograms of cocaine would be higher. The Defendant then proceeded to remove approximately $100,000 from the duffel bag and hand it to CI-2. The Defendant kept the duffel bag with him because it contained additional money within it, which law enforcement suspected belonged to the unidentified individuals the Defendant called during the meeting. While these discussions were taking place, the Defendant asked CI-2 and the UC if there was a smaller bag in the backseat. The UC noticed CI-2 was sitting on a black fanny pack which the UC retrieved. Upon picking up the bag, the UC was able to feel what the UC identified as a midsize semiautomatic handgun. As the UC handed the bag to the Defendant, the UC asked, "Oh, you got your heater in there?" The use of the word "heater" was in reference to the firearm. The Defendant answered in the affirmative. The UC proceeded to hand the bag to the Defendant. This meeting was audio/video recorded. Following the meeting, law enforcement took custody of the currency which was placed into evidence. After the meeting, law enforcement conducted surveillance on the Defendant after he departed the meeting. Law enforcement observed the Defendant meet with two males inside of the

---

[3] The Complaint refers to these others as "co-conspirators." Without making any legal conclusions as to criminal liability, I infer from the Complaint that the Defendant at least had a relationship with these individuals and was potentially working in conjunction with them.

mall before following them to a Honda Accord, white in color, bearing Florida tag HVKQ91. All three subjects entered the vehicle and departed the location at which time surveillance was terminated. A check of the vehicles tag showed the vehicle was registered to D.G.

On or about September 29, 2020, after law enforcement had terminated their surveillance, the Defendant advised CI-1 that he would be staying at the Hard Rock Hotel in Hollywood, Florida, to await the arrival of the cocaine. Later in the evening, CI-1 met with the Defendant at the hotel at which time the Defendant stated that he would have more money on the following day in order to purchase an additional 5 kilograms of cocaine.

On or about September 30, 2020, CI-1 advised the Defendant that the load had arrived. CI-1 subsequently drove to the Hard Rock Hotel in Hollywood, Florida, and picked up the Defendant. Afterwards, CI-1 drove the Defendant to the designated meeting location in a parking lot. Upon arriving at the meeting location, CI-1 exited the vehicle and met with CI-2 and the UC, both of whom were waiting in a nearby vehicle. CI-1 retrieved a backpack containing sham kilograms of cocaine. CI-1 proceeded to carry the backpack back to CI-1's vehicle, where the Defendant was waiting. CI-1 provided the backpack to the Defendant. While the Defendant opened one of the bags, CI-1 walked back to the UC's vehicle. At that time, law enforcement converged on CI-1's vehicle and took the Defendant into custody. Agents subsequently located the Honda Accord, white in color, bearing Florida tag HVKQ91 in the valet area of the Hard Rock Hotel. At that time, law enforcement located D.G. and a third subject ("R.K."), both of whom were with the Defendant on the previous day. At the time, R.K. was carrying a duffel bag similar in appearance to the one that Alzate Bustamante used to transport the $100,000.00 to CI-1, CI-2, and the UC during the September 29, 2020, meeting.

TFO Passman spoke to the Defendant in an attempt to gain the Defendant's cooperation.

6

The Defendant indicated a willingness to cooperate. While speaking with the Defendant, TFO Passman observed multiple text messages and missed calls from a contact on the locked screen of the Defendant's phone. One such message read "Yo everything good?" TFO Passman asked the Defendant if he needed to speak with the individual in question in order to preserve his ability to proactively cooperate with law enforcement. The Defendant answered in the affirmative. While on the call, the Defendant alerted the contact – later identified as D.G. – to his arrest, prompting TFO Passman to take the phone away from the Defendant.

A short time after the Defendant had made the call to D.G., law enforcement observed D.G. enter the white Honda Accord and depart from the hotel. R.K. remained at the hotel. A detective with the Broward Sheriff's Office followed D.G. out of the parking lot and north on Interstate 441. The detective observed D.G. make a lane change into the left turning lane without signaling, causing other motorists to brake in order to avoid a collision. At this time, the detective conducted a traffic stop on D.G.'s vehicle. Upon making contact, D.G. advised the detective that there was a gun in the trunk of the vehicle. D.G. gave consent for a search of the vehicle. Law enforcement ultimately located a black fanny pack in the trunk of the vehicle containing a loaded .45 caliber handgun. The fanny pack was similar in appearance to the one that the Defendant had in his possession during the September 29, 2020, meeting. Law enforcement seized the firearm.

Law enforcement also approached R.K., who was in possession of a black duffle bag similar to the one the Defendant had possessed the previous day. Law enforcement seized the duffle bag and found that it contained approximately $150,000.

2. Additional Facts Proffered by the Government

As discussed below, the Defendant had told Pretrial Services that he had formerly operated a real estate investing business named Standard Investments, LLC. The Government proffered

7

(and TFO Passman adopted) that bank records show Standard Investments, LLC's bank account receiving a deposit of approximately $51,000 in July 2019, approximately $50,000 of which was withdrawn two days later. The account received a deposit of approximately $60,000 in January 2020, and withdrawals of approximately $31,000 and $26,000 were made in March and April 2020, respectively. The 2020 activity contradicts the Defendant's statement to Pretrial Services that the business had not operated for the past year. These deposits were made by check, not cash, at least one of which, TFO Passman believed, was from a pressure washing company.[4]

According to the Government, Customs and Border Protection records show that the Defendant travelled to Colombia in both 2019 and 2020 and made an entry into the United States through San Ysidro (San Diego) California in 2018 without a corresponding record of exit. TFO Passman did not know the purpose for any of these trips.

3. Pretrial Services Report

The Pretrial Services Report noted that the Defendant is 27 years old. He was born in Colombia but immigrated to the United States at age 7 and is now a naturalized United States citizen. He reported travel to Europe in 2018 and Colombia in 2020, but did not report the 2019 trip to Colombia identified by the Government. He resides in Tampa, Florida, with his mother, younger brother, and fiancée. He previously operated the aforementioned, reportedly defunct, real estate investment business and an auto parts business, and he has recently started a job at as an IT assistant. His only criminal history is a DUI from five years ago, and he has no history of mental or physical health problems.

---

[4] TFO Passman averred that the owner of the pressure washing company was believed to be involved in criminal activity. However, he could not remember the name of the individual and could provide no further information about any alleged criminal activity. Therefore, I do not credit, and do not rely upon, the suggestion that the owner of the pressure washing company is suspected of illegal conduct.

4. <u>Defendant's Family</u>

Defendant's sister, Angela Bustamante, has resided in Tampa for more than 20 years. She and her husband own a home, where they live with their two children, that has approximately $140,000 in equity. Ms. Bustamante and her husband are willing to co-sign a bond with their home as collateral, and she expressed confidence that the Defendant would abide by conditions of bond set by the Court. She further testified that her understanding was that the Defendant's 2020 trip to Colombia was a vacation to celebrate Valentine's Day and the birthday of the Defendant's girlfriend (who is also from Colombia). She testified that the Defendant does not have close family remaining in Colombia and took the trip in part because he had not had opportunities to explore Colombia. Ms. Bustamante also testified that the Defendant's 2018 trip to Europe was a last-minute trip with the Defendant's then-girlfriend, which was paid for by that girlfriend's aunt. Regarding the Defendant's employment, Ms. Bustamante testified that she had spoken with the supervisor at the Defendant's new job, who assured her that the Defendant could continue working there if released.

Ms. Bustamante admitted that she was unaware of any of the activities described in the Complaint, including any trips by her brother to south Florida. She admitted that, while they are close, they have not seen each other in the past month and their contact has been less frequent during the COVID-19 pandemic. Ms. Bustamante also testified that her mother has a real estate investment company of her own, separate from the Defendant's, through which her mother owns several rental properties.

Defense counsel proffered, without opposition, that the Defendant's mother owns her residence, which has between $90,000-$190,000 worth of equity. The Defendant's mother would also be willing to put this home forth as collateral for a bond.

C.      STATEMENT OF REASONS FOR DETENTION

Title 18, United States Code, Sections 3142(g) requires the Court to consider the nature and circumstances of the offense, the weight of the evidence against Defendant, the history and characteristics of the Defendant, and the nature and seriousness of any danger to a person or to the community caused by the Defendant's release. After considering those factors in detail as described below, and based upon the above findings of fact, the Court specifically finds by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure the Defendant's appearance at trial. 18 U.S.C. § 3142(e).

1. The nature and circumstances of the offense charged.

The alleged offense is quite serious, involving the attempted purchase of approximately ten kilograms of cocaine. The fact that the transaction turned out to be a "sting" involving sham cocaine is of little significance, given the Defendant's alleged willful participation. Significantly, the offense involved a substantial amount of money – approximately $100,000 in cash provided by the Defendant directly with an additional $150,000 in the custody of "investors" with whom he was apparently connected. The Defendant is alleged to have made statements indicating he planned on selling the cocaine for $35-45,000 per kilogram and sent text messages indicating that he had people waiting on the expected arrival of the cocaine. The significant amount of money involved, the Defendant's stated intent to sell the cocaine for an amount consistent with the price of a cocaine in the area, and his apparent coordination with others belies defense counsel's description of the Defendant's conduct marking him as unsophisticated.

There is evidence that the Defendant possessed a firearm at the first (though not the second) meeting with the CIs. Also, though, as defense counsel argued, the Defendant was arrested without incident, while purporting to cooperate with law enforcement, the Defendant notified one of his

apparent confederates of his arrest, giving that person an opportunity to flee.

If convicted of the charged offenses, the Defendant would face a mandatory minimum sentence of 10 years' imprisonment, with a maximum sentence of life.[5]  The Government also noted that, despite his relatively lack of criminal history, the Defendant would not be safety valve-eligible because of the apparent possession of a firearm at one of the recorded meetings.

2. The weight of the evidence against Defendant.

The weight of the evidence against the Defendant is strong.  The evidence consists of audio and video recorded meetings and communications between the Defendant, the CIs, and the UC, as well as the approximately $100,000 in cash the Defendant delivered and the more than $150,000 subsequently found with his associate.

3. Defendant's history, characteristics, and criminal history.

Much of the Defendant's background weighs in favor of his release.  He has minimal, unrelated criminal history.  He is a young man who has lived most of his life, including all of his adult life, in Tampa, resides with his mother, brother, and fiancée, and has his sister (who is obviously supportive of him) also living in the area.  He is employed at a job to which he apparently can return.

The Defendant does have some foreign ties, in that he was born in Colombia, still has a Colombian passport (per the Pretrial Services Report), and has traveled to that country twice in as many years.  On the other hand, he is a naturalized United States citizen, and his sister insists that

---

[5] During his testimony, TFO Passman indicated that the Defendant is also under investigation in another district for alleged money laundering.  TFO Passman presented no further details of this investigation, and, therefore, I do not consider any such allegations in assessing the seriousness of the Defendant's conduct.  However, the fact that the Defendant is now aware that he could potentially face additional charges does influence the Court's evaluation of the Defendant's incentive to flee.

their family ties to Colombia are now minimal.

What troubles the Court, however, are a series of actions and misrepresentations that undermine the Court's faith in the Defendant's character and willingness to abide by bond conditions. As described above, the Defendant apparently failed to disclose one of his trips to Colombia – in 2019 – to Pretrial Services. He similarly represented to Pretrial Services that his real estate investment business had not operated in a year, and yet $60,000 of unexplained money flowed through its account earlier this year. His apparent access to such a large quantity of money, in addition to the large quantities of cash that he apparently had access to as part of the alleged criminal conduct, clash with defense counsel's attempt to portray the defendant as a man of "modest means." Finally, there is the Defendant's conduct in notifying his associate of his arrest while purporting to cooperate with law enforcement. To be clear, no defendant is under any obligation to cooperate with law enforcement and no defendant's decision to refuse to cooperate against others should be counted against him for purposes of assessing his risk of flight. However, the fact that the Defendant began to cooperate with law enforcement and then used it as an opportunity to notify his associates does affect whether the Court can trust his promise to abide by conditions and colors what choices the Court can expect him to make while on bond. Any one of these three actions taken in isolation could be dismissed as either an innocent mistake or an error made in the heat of the moment. But taken together, their implication is more significant.

4. <u>The nature and seriousness of the danger to any person or the community that would be posed by Defendant's release.</u>

The nature and seriousness of the danger posed by the Defendant should he be released comes from the risk that he could engage in narcotics trafficking activities similar to those alleged in the criminal complaint. The Defendant's potential access to cash and relationships with others

involved in similar activity do create some risk in this regard. However, this is also a risk that could potentially be mitigated by conditions of release.

    5. <u>Conclusion</u>

As described above, the nature and seriousness of the offense, the weight of the evidence, and some of the Defendant's history and characteristics, weigh in favor of granting the Government's motion for pretrial detention. There is also a presumption in this case that there are no conditions or combination of conditions that would reasonably assure the Defendant's appearance or the safety of the community. The Defendant asserts that a bond which subjects his mother's and sister's homes to forfeiture, combined with location monitoring, would provide a sufficient incentive for the Defendant to abide by his conditions and to appear in court as necessary. However, while I find the Government has not met its higher burden of clear and convincing evidence to show that no conditions will assure the safety of the community, I do find that the Government has met its burden by a preponderance of evidence of showing that no combination of conditions -- including the Defendant's proposed conditions -- are sufficient to assure his appearance. In reaching this conclusion, I am influenced by the fact that the Defendant faces a strong case which would subject him to at least a decade in prison, as well as the facts that the Defendant apparently had such quick access to large amounts of cash, and the several actions described above that undermine my faith in his willingness to abide by conditions of bond. While the Defendant may have rebutted the presumption by coming forward with evidence regarding his ties to the Tampa community and the testimony of his sister, the presumption still continues as

evidence weighing in favor of detention. Given all of the circumstances described above, I find that detention is warranted.

D.  DISPOSITION

Being fully advised, the Court hereby ORDERS that the Defendant, Andres Felipe Alzate Bustamante, be detained prior to trial and until the conclusion thereof.

The Court further ORDERS:

1.  That the Defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2.  That the Defendant be afforded reasonable opportunity for private consultation with counsel; and

3.  That, on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined deliver the Defendant to a United States marshal for the purpose of an appearance in connection with a court proceeding.

DONE AND ORDERED at Fort Lauderdale, Florida this 15th day of October 2020.

Jared M. Strauss
United States Magistrate Judge

Copies to:

Counsel of Record
United States Marshal
United States Pretrial Services